## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In Re:

    KEITH J. BRUNNER, and
    LISA M. BRUNNER,

Case No. 14-20297-mdm

Chapter 12

Debtors.

## CHAPTER 12 PLAN OF REORGANIZATION DATED MAY 21, 2014

    The above Debtors hereby propose and present their Chapter 12 Plan of Reorganization.

## ARTICLE I
## DEFINITIONS

    For purposes of this Chapter 12 Plan of Reorganization and any subsequent amendment or modifications, the following terms shall have the following meanings:

1.1     **Allowed Claim** means a claim which is filed timely pursuant to §501 of the Bankruptcy Code and/or which is allowed pursuant to §502 of the Bankruptcy Code.

1.2     **Bankruptcy Code** means Title 11 of the United States Code as it exists or may be hereafter amended.

1.3     **Bankruptcy Court** or **Court** means the United States Bankruptcy Court for the Eastern District of Wisconsin in which the Chapter 12 petition of the Debtors was filed.

1.4     **Bankruptcy Rules** means the Rules of Bankruptcy Procedure which have been promulgated and made effective as of August 1, 1983, together with any amendments and modifications thereto.

1.5     **Claim** has the meaning set forth in §101(5) of the Bankruptcy Code.

1.6     **Claimant** means the holder of a claim.

1.7     **Class** means a category of holders of claims or interests which are substantially similar to other claims or interests in such class and which category has been segregated for treatment as part of this Plan pursuant to Section 1222(b) of the Bankruptcy Code.

1.8     **Code** means the Bankruptcy Code, 11 U.S.C. §101, et seq. as now or hereafter is in effect.

1.9     **Confirmation Date** means the date upon which the Plan is confirmed in open court.

1.10     **Confirmation Order** means the order entered by the Bankruptcy Court confirming the Plan.

1.11     **Debt** means liability on a claim.

1.12     **Debtor** means the Chapter 12 Debtors in this Chapter 12 case.

Drafted By:
Julie E. Furman Stodolka
Steinhilber, Swanson, Mares, Marone & McDermott
107 Church Ave, PO Box 617
Oshkosh, WI 54903-0617
Tel: 920-235-6690 / Fax: 920-426-5530
jstodolka@oshkoshlawyers.com

1.13 **Discharge** means an order of the Court pursuant to 11 U.S.C. § 1228 which terminates the personal liability of Debtors for all debts provided for by the plan, allowed under § 503 of the Bankruptcy Code or disallowed under §502, with exceptions as enumerated in §1228; as further elaborated in §524 of the Bankruptcy Code, "Effect of Discharge."

1.14 **Effective Date** means the date upon which the entry of the Confirmation Order by the Bankruptcy Court confirming this Plan becomes final and non-appealable.

1.15 **Family Farmer** shall mean a person or entity eligible for Chapter 12 relief as defined in §101 of the Bankruptcy Code.

1.16 **Farmer** means a person engaged in farming operations as defined under §101 of the Bankruptcy Code.

1.17 **Farming Operation** means farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an un-manufactured state as defined by §101 of the Bankruptcy Code.

1.18 **Final Order** means an order of judgment of the Bankruptcy Court which has been entered or which has become final in accordance with the Bankruptcy Rules.

1.19 **Interest** shall mean the ownership rights of the Debtors and shall have the same practical meaning as Equity Security.

1.20 **Petition Date** shall mean the date of filing of this Chapter 12 case, January 13, 2014.

1.21 **Plan** or **Plan of Reorganization** means this Plan, all addenda, exhibits, schedules, releases or other attachments hereto, and shall include any subsequent amendments or modifications of this Plan filed either before or after confirmation date.

1.22 **Pro Rata** means the same proportion that a claim or interest in a particular class bears to the aggregate amounts of all claims or interests in such class.

1.23 **Schedules** means the Statement of Financial Affairs and Schedules of Assets and Liabilities filed in this case, including all amendments or supplements thereto.

ARTICLE II
GENERAL PREMISES OF THE PLAN

2.1 <u>The basic premise of this Plan is</u>: Debtors were long-time dairy farmers until they were forced to sell their herd in the Spring of 2013. In early February of 2014, with court approval, Debtors applied approximately $63,000.00 in lawsuit settlement proceeds plus $64,000.00 in funds borrowed from private lenders, to purchase a herd of 75 milk cows in lactation. The new herd now generates sufficient milk income to allow Debtors to resume payments on their pre-petition secured loans, negotiate ordinary credit terms with suppliers for 2014 crop inputs and plant the 2014 crop. Using their own land and approximately 150 acres of land which they have rented for many years, Debtors will be able to grow enough feed to supply the herd through the winter of 2014-2015, supplemented only by typical nutrient and bulk feed items normally purchased by dairy farmers.

By the time of filing this plan, May 2014, Debtors' net operating income is sufficient to resume interest only payments to Debtors' primary secured lender Fidelity National Bank. Starting in May and through the first quarter of 2015, Debtors propose to make interest only payments on their obligations to Fidelity as modified by this Plan, while maintaining input, feed

Page 2

and herd financing payments to other creditors on normal and usual terms. Starting in April 2015, Debtors will resume fully-amortized payments to Fidelity Bank, with interest rates and terms modified as stated below in section 4.2. Generally, the three remaining unpaid obligations to Fidelity will be treated as one real-estate secured loan, with the combined balance on the date of filing in the allowed amount of Fidelity's claim. The terms of the obligation will be modified so that the allowed amount of Fidelity's claim will be paid at an interest rate of 5.5%, amortized over 25 years. Payments to Fidelity will be made by Debtors according to these modified terms until the loans are paid in full.

USDA, Farm Service Administration negotiated "distressed borrower" terms with the Debtors at various times in the last few years and Debtors are current on those payments. Debtors will continue to pay FSA on these terms for the balance of that program, after which the loans will amortize based on then-current published USDA terms for this type of loan.

Debtors have traditionally paid property taxes, income taxes and employee withholding taxes when due and they will continue to do so. Debtors have not had employees since May 2013.

The secured debt owed to Fidelity Bank and FSA consumes the net value of the real property and tangible personal property in a hypothetical liquidation. Both lenders also have loans secured by equipment and these loans are under-secured and cross-collateralized to the real estate. These factors render unsecured the judgment liens of Kelly Phillips Oil Company and TD Bank. This is illustrated in Debtors' Liquidation Analysis, Exhibit "A." The allowed claims of these judgment lien creditors will be paid as unsecured claims in this case. After discharge, Debtors will apply to satisfy the underlying judgment liens in State court.

Unsecured creditors will be paid a dividend of $33,167.00 in the fourth year of the Plan. Seven creditors filed proofs of unsecured claims totaling $158,722.44. Assuming all of these claims are allowed, there will be a dividend of approximately 20%.

    2.2    <u>Circumstances Leading to the Filing of this Plan</u>. Debtors began farming at their current location in 1990. They tried to expand in 2001 by installing a robotic milking system but were never able to make it work properly. The system was removed in 2007 but herd productivity had been damaged. At that time Debtors made the fateful choice of Bowers Feed & Grain as their primary feed supplier. Debtors provided feed specifications to Bowers but Bowers substituted cheaper ingredients on many occasions, without informing Debtors. In many cases, these substitutions caused harm to the cows or reduced their productivity, often in ways that Debtors could have compensated for if they had known what was wrong. They had no idea that Bowers was providing them with adulterated and sub-standard feed, although they and their veterinarian tried multiple tests, unsuccessfully, to determine the cause of the problem. By 2012, Debtors lenders believed Debtors were failing and restricted new credit or modification of terms. Only late in 2012 did Debtors learn that their herd's lack of productivity started with the defective feed provided from 2007 through 2010. At that point they counter-claimed against Bowers in its collection action, and after grueling discovery and a multi-day trial in July 2013,

Page 3

obtained a jury verdict in their favor in an amount exceeding $265,000.00. Debtors had, however, run low on feed in the Spring of 2013 and their lender was unwilling to extend new credit. Thus Debtors were forced to sell their herd in May 2013, a few months before trial. Debtors' net proceeds from the litigation were only $101,000.00, and of this amount only approximately $63,000.00 was available to purchase a new herd after Debtors paid for the legal and business assistance necessary to develop a plan to re-start the dairy. This amount, plus a modest additional investment of $64,000.00 from family and personal contacts, has proved sufficient. Debtors were reluctantly forced to file for bankruptcy protection because, even with private loans, the litigation proceeds were not sufficient to pay all trade creditors. Bankruptcy Court approval of their private borrowing was obtained in February 2014 and the new herd was purchased shortly thereafter.

      2.3    <u>Value of the Farm</u>. Debtors obtained a Value Opinion on their real estate, buildings and equipment in April 2013 from Ronald Carley, a local real estate and livestock seller. Carley valued the Debtors' real estate in a range from $1,815,400.00 to $2,306,500.00 for a successful and properly-advertised auction. General Wisconsin farm real estate values have softened since that time but demand in Debtors' local area, near Green Bay and the Village of Denmark, may still be high.

      Debtors' equipment is relatively old but still functional. FSA, which holds the first lien in the machinery and equipment, did a collateral check in December 2013, inventoried the equipment and valued it at $404,340.00 but liquidation value would be lower.

      2.4    The Debtors will value their property at the hearing held on confirmation of this Plan. The evidence which may be used by the Debtors to establish valuation will be the schedules, the Debtors' testimony, and/or the testimony of any appraisers or expert witnesses. Any creditors who hold mortgages on, pledges against, liens against, or security interests in the assets of the Debtors will be deemed inadequately, adequately or fully secured based upon the valuations made by the Bankruptcy Court at the confirmation hearing. Those creditors whose security (collateral) is less in value than the amount of the claim which is secured by such collateral will have their secured claim reduced to the value of such collateral; and the under-secured portion of their claim will be deemed an unsecured claim and dealt with as such in the class which treats general unsecured claims. If the value of a creditor's collateral exceeds the claim which is secured by such collateral, then such creditors will be deemed fully secured for that portion of their claim which is fully and amply secured in terms of collateral value. Such creditors will be deemed fully secured for purposes of this Plan. The holders of fully secured claims and the secured portions of the partially secured claims will retain their collateral under this Plan, unless there is a specific provision of the Plan which allows the surrender, transfer, or abandonment of such collateral prior to or after the confirmation date, and such creditors will receive payment of said secured claim(s) over future years out of the future earnings of the Debtor, together with an appropriate interest rate, as set out below.

      The under-secured portions of the partially secured claims will be deemed unsecured claims for purposes of this Plan, and such unsecured claims will receive their pro rata portion of

Page 4

distributions made to unsecured creditors from future earnings of the Debtor. A distribution of $33,167.00 during the fourth year of the Plan is intended, which would be approximately a 20% distribution, without post-confirmation interest, based on the actual claims filed by the deadline to file claims ("Claims Bar Date") which was May 12, 2014. Seven claimants filed unsecured claims totaling $158,722.44.

If a creditor holding a pledge against, lien against, mortgage on, or security interest in property of the estate as defined in §541 desires to prove up and have allowed an unsecured claim based on the premise that he or she is under-secured and under-collateralized, then motions for valuation for such creditors must be filed prior to the initial confirmation on the Debtors' Plan, or such creditor will be deemed to be fully secured. At confirmation, the Debtors need not file separate motions for valuation, but will prove the values of their property as set forth above.

    2.5    <u>Plan Payments to the Chapter 12 Trustee</u>. Only certain payments, identified below, will be made by the Debtors to the Trustee monthly and only during the periods indicated:

    A.    Interest only payments, + trustee's commission @ 10%, for secured first priority creditor Fidelity Bank & Trust during the first eleven months of the Plan while Debtors are making interest-only payments, i.e., from May 2014 through March 2015.

    B.    Payments for unsecured creditors in the fourth and final year of the Plan, from May 2017 through April 2018.

These payments will be due at any time during each calendar month of the year in question. The Trustee shall make the payments to the designated creditors monthly. All payments made through the Chapter 12 Trustee will be subject to the Trustee's commission. Prior to confirmation, Debtors will make payments to the client trust account of Debtors' counsel and these funds will be transferred to the Trustee after the Effective Date.

    2.6    <u>Direct Payments to Creditors</u>. The other periodic payments required by this Plan will be made by Debtors directly to their secured creditors, Fidelity National Bank, FSA and Debtors' private lenders concerning the post-petition loans for purchase of a herd. Ordinary course payments to trade and personal creditors, and payments to taxing agencies including income taxes, property taxes and employment taxes if any, shall be made debtor-direct, on ordinary terms. None of these payments shall be subject to the Trustee's commission.

    2.7    Each claim or interest in the same class will receive the same treatment as all other claims and interests in that class, unless a particular claim or interest agrees to a less favorable treatment.

    2.8    <u>Modification of Plan</u>. The Debtor reserves the right to modify this Plan at any time before the entry of the Confirmation Order so long as it meets the requirements of §1222 of the Bankruptcy Code; and after the Debtor files a modification, the modified Plan becomes the

Page 5

Plan, all of which will be pursuant to §1223 of the Bankruptcy Code. The Debtor also reserves the right to modify this Plan at any time after the Confirmation Date, and before the completion of payments to unsecured creditors under this Plan; which modifications will comply with §1229 of the Bankruptcy Code.

2.9     <u>Liquidation Test</u>.  Plan payments to judgment lien holders and unsecured creditors will exceed the amounts, if any, which they would receive if the Debtors were discharged in Chapter 7 on the Confirmation Date, as shown in Debtors' Liquidation Analysis, Exhibit "A." The Liquidation Analysis was strongly negative based on asset and secured debt values and tax consequences, so administrative claims of the Chapter 12 case and expenses of Chapter 7 administration were not even referenced.

2.10    Debtors will make all Trustee payments proposed in this Plan from business operations as supplemented by Lisa Brunner's wage earnings.

ARTICLE III
CLASSES OF CLAIMS OR INTERESTS

3.1     <u>Class 1-A</u> <u>Administrative Claims</u> - Included in this class are all costs of administration.  Particularly, in this class are included the fees & cost reimbursements of the attorney for the Debtors in an amount of approximately $25,000.00, subject to approval by the Court; Debtors' Farm Advisor Martin Cowie in an amount of approximately $20,000.00, subject to approval by the Court, and any other costs for other  professionals approved by the Court.

Class 1-B <u>Brown County Treasurer</u> - Included in this class is the secured claim, if any, of the Brown County Treasurer for current real estate taxes on the Debtors' property.  There is no arrearage claim and Debtors will pay current year taxes as they come due out of business proceeds through performance of their Plan.  No Proof of Claim was filed in this Class.

3.2     <u>Class 2</u>  - <u>Fidelity National Bank</u>.  The only creditor in this class is Fidelity National Bank, Appleton, Wisconsin. The claim is based on three obligations, as follows, all secured on Debtors' real estate or equipment as indicated, and cross-collateralized:

|  | Principal Balance @ filing | Orig Terms | Collateral |
|---|---|---|---|
| Loan 7818 | $  800,061.08 | 7.5%; 20 yr amort | Real Estate |
| Loan #7821 | 167,621.64 | 7.75%; 10 yr amort | Machinery & equipment |
| Loan 807824 | 35,791.92 | 5.5%; 7 yr amort | Unspecified |
| Total | $ 1,003,474.60 | | |

The claims had a combined pre-Petition principal balance of $1,003,474.64.  The proof of claim filed by Fidelity National Bank states an unpaid balance of $1,054,254.79, an amount which presumably includes post-maturity interest and penalties and attorneys' fees and costs to

Page 6

that date.  The obligations are fully secured based on even a conservative interpretation of the appraisal commissioned by the Debtors.  Fidelity's liens are in first position on Debtors' real property and in second[1] position after FSA on Debtors' machinery and equipment.  Debtors' current herd is not subject to the liens of Fidelity, pursuant to the effect of 11 U.S.C. 552 and because Fidelity's security interests do not extend to tort recoveries.

     3.3    <u>Class 3</u> - <u>USDA, FSA</u>. The only creditor in this class is the United States Department of Agriculture, Farm Services Administration.  The claim is based on four obligations, as follows, one of which is secured in second position behind the Class 1 creditor on real estate while the other three are secured in first position on Debtors' equipment:

| | Est Bal @ filing | Collateral | Interest Rate | Term |
|---|---|---|---|---|
| FSA Loan # 43-26 | $ 6,372.79 | Personal property | 3.750% | 15 yrs |
| FSA Loan # 44-27 | 165,359.16 | Personal Property | 1.375% | 15 yrs |
| FSA Loan # 44-28 | 144,277.46 | Personal Property | 1.375% | 15 yrs |
| FSA Loan # 41-29 | 220,211.29 | Real estate | 3.750% | 33 yrs |

     3.4    <u>Class 4</u> - <u>Judgment Lien Creditors</u>    The creditors in this class are Kelly Phillips Oil Company and TD Bank, each the holder of a judgment lien docketed against Debtors outside the preference period.  The combined claims total approximately $26,000.00 at the time of filing.  Based on the Liquidation Test summarized in Exhibit "A," there is no equity in Debtors' real property to support these liens.  The claims will be paid as Class 5 unsecured claims, without post-petition interest, pro rata with other Class 5 unsecured claimants, and the liens will be removed from Debtors' property via the Wisconsin Satisfaction of Judgment procedure after entry of Discharge.

     3.5    <u>Class 5</u> - <u>General Unsecured Creditors</u>.    The creditors in this class are the allowed unsecured claims of creditors without priority as well as the unsecured or deficiency part of any secured claims for which the creditor is paid as an unsecured or under-secured claim.  This includes the holders of both claims in Class 3.4, and the claims of creditors, if any, without priority and not included in the above-referenced classes.  Debtors scheduled unsecured claims totaling $530,310.15.  Seven members of Classes 3.4 and 3.5 filed claims in the total amount of $158,722.44, which indicates that holders of allowed unsecured claims will be paid a percentage distribution of approximately 20% through this Plan.  Debtors will pay $33,167.00 to these creditors during the fourth year of their Plan, even though no dividend to unsecured creditors is required by the Liquidation Test summarized in Exhibit "A."

Debtors believe their schedules are accurate and that no creditors have been omitted.  The Claims Bar Date was May 12, 2014.

---

[1]  Fidelity's first priority liens on Debtors' livestock & equipment were paid in full from the proceeds of Debtors' cattle auction in May of 2013, which moved FSA's personal-property secured obligations into first position on Debtors' remaining machinery and equipment.

Page 7

3.6　　Class 6 - Executory Contracts - Debtors lease land from several different lessors on long-term leases, all of which Debtors hereby assume.  All lease payments were current as of the date of filing.  Debtors also provide animal care services to third parties, and they assume these leases.  All payments to or from Debtors under these leases were current as of the date of filing.  There are no other executory contracts.

3.7　　Class 7 - Equity Interests.  The only claimants in this class are the Debtors.

ARTICLE IV

GENERAL PROVISIONS OF THE PLAN AND PROVISIONS
FOR ALTERING OR MODIFYING THE RIGHTS OF CREDITORS

A.　　General Provisions of the Plan and Means for Execution - The provisions of this Plan under "Article II, General Premises of the Plan" pages 2 - 6, are incorporated here by reference.

B.　　Specific Treatment of Claims and Interests

4.1　　Class 1-A & 1-B  Administrative Claims, including property taxes - The only claims in Class 1-A are the administrative fees of Debtors' counsel and Farm Advisor which, subject to approval by the Court, will be paid when allowed, from retainer funds paid to the professionals pre-petition or from business operations as available.  Total fees are estimated at $25,000.00 for Debtors' attorneys and $20,000.00 for Debtors' farm advisor.  The claims of Brown County for property taxes, Class 1-B, will be paid when due on regular terms; there is no arrearage.

4.2　　Class 2 - Claims of Fidelity National Bank,  The claim of Fidelity National Bank shall be treated as follows:  Debtors shall pay the allowed amount of Fidelity's claim at the time of filing in the approximate amount of $1,054,254.79.  This amount  shall bear interest at the rate of 5.5% per annum, amortized over 25 years, calling for the monthly payments stated below:

| Balance at Filing | Int Only Pmts (approx) in Yr 1 | New Fully Amortizing Pmts |
|---|---|---|
| $1,054,254.79 | $4,845 mo starting 5/2014 | $6,474.00/ mo starting 4/2015 |

In the first 11 months of the Plan, from May of 2014 through March 2015, interest-only payments shall be made to the Class 2 claimant on the obligations as modified.  The payments shall be made by the Debtors to the Chapter 12 Trustee (or to their counsel's client trust account prior to confirmation) in an amount equal to 110% of the "interest only" payment estimated above, during each calendar month from May 2014 through March 2015.  The total amount paid to the trustee in each calendar month during this period therefore will be approximately $5,339.00.  No late charge may be assessed on any monthly payment received by the Trustee on or before the final day of each month (or the first business day following that date if the final date

Page 8

falls on a weekend or holiday); but the normal, contractual late charge may be assessed if the payment is received by the Trustee late.

In April 2015, Debtors shall commence paying the Class 2 claimant fully amortizing principal and interest payments in the amounts specified above, paid debtor-direct, and at the time and places prescribed in the original obligations. These payments shall not be subject to the Trustee's Commission.

All other terms and conditions of the underlying notes and mortgage shall remain in full force and effect to the extent not modified herein. The collateral which this creditor had as of the date of the filing of the petition herein shall remain its collateral. The automatic stay shall remain in full force and effect throughout the term of the plan except that it shall be modified to allow Fidelity to provide regular statements, including tax reporting of interest paid and year-end balances; accurate credit reporting reflecting Debtors' compliance with the modified terms of their loans, and to make regular contacts directly to the Debtors or their counsel to request information, provide information or obtain clarification of delays in payment.

4.3     Class 3 - Claims of USDA, FSA. During this case, the claims of the United States Department of Agriculture, Farm Service Administration shall be paid debtor-direct according to the distressed-borrower terms negotiated with the Debtors pre-petition, as follows:

|  | Est Bal @ filing | Payment Terms during Plan period & immediate aftermath |
|---|---|---|
| FSA Loan # 43-26 | $ 6,372.79 | $1,799.12 due 1/1/2016 & $1,800 annually thereafter |
| FSA Loan # 44-27 | 165,359.16 | 3,069.00 due 1/1/2017; $18,412 due 1/1/2018 |
| FSA Loan # 44-28 | 144,277.46 | 3,663.00 due 1/1/2015; $5,948 due 1/1/2016; 7,380 due 1/1/2017; $14,538 due 1/1/2018 |
| FSA Loan # 41-29 | 220,211.29 | 2,210 due 1/1/2017; $13,257 due 1/1/2018 |

These payments shall not be subject to the Trustee's Commission. All other terms and conditions of the underlying notes and mortgage shall remain in full force and effect to the extent not modified herein. The collateral which this creditor had as of the date of the filing of the petition herein shall remain its collateral. The automatic stay shall remain in full force and effect throughout the term of the plan except that it shall be modified to allow FSA to provide regular statements, including tax reporting of interest paid and year-end balances; accurate credit reporting reflecting Debtors' compliance with the modified terms of their loans, and to make regular contacts directly to the Debtors or their counsel to request information, provide information or obtain clarification of delays in payment.

4.4 & 4.5     Class 4 & Class 5 Claims: Claims of Judgment Lien Creditors and General Unsecured Creditors. The claims of the Class 4 and Class 5 Claimants shall be paid as Class 5

Page 9

General Unsecured Creditors. Holders of allowed Class 4 or Class 5 unsecured claims shall share in a distribution of approximately $2,764.00 per month paid by the Chapter 12 Trustee. To fund these distributions, Debtors shall pay installments of $3,071.00 per month to the Trustee during the fourth year of the Plan commencing in May 2017, from which the Trustee shall pay her own commission and the distribution to these claimants. The total distributed to Class 4 and Class 5 unsecured creditors therefore will be approximately $33,167.00, even though no dividend at all is mandated by the Liquidation Test summarized in Exhibit "A."

      4.6    Class 6 - Executory Contracts. The following leases and executory contracts are assumed on their current terms:       All current leases of crop land
                                    All current contracts under which Debtor cares for animals

      4.7    Class 7 - Equity Interests - The Debtors shall retain their ownership interests in their assets. After successful completion of all payments proposed hereunder for a period of 48 months commencing May 2014, completion of the Plan hereunder, and a determination thereof by the Court, Debtors shall receive a discharge of all dischargeable debts and their assets shall be free and clear of all claims with the exception of liens which survive this Plan due to terms which extend beyond the 48 months of the Plan. Debtors reserve the right to terminate this Plan in less than 48 months in the event all Claimants in the Judgment Lien and Unsecured Creditors Classes and claims of higher priority to be paid through this Plan are paid in full; or if other circumstances so dictate to the satisfaction of the Court.

      C.    Feasibility Analysis - The plan is feasible, as show by the projections which accompany this Plan as Exhibit "B." Debtors believe they have accounted for all reasonable costs of their operation, family living expenses and a cushion for emergencies; that they have operated their farm under more difficult conditions in previous years and will be able to carry out the plan laid out here.

      D.    General Assumptions - It should be pointed out, however, that if there is either a weather-related crisis or the markets drop to unreasonably low levels or Debtors, as farmers, are afflicted by other similar crises outside their control, that the Debtors may seek to modify the Plan to change the proposed payments herein. This Plan is not intended to be aborted, or this case dismissed or converted to Chapter 7, if payments are not timely made under this Plan and if moratorium(s) or extension(s) can and/or should be granted by this Court for reasonable cause(s).

ARTICLE V
MISCELLANEOUS PROVISIONS

      5.1    The completion of payments under this Plan and the granting of a Discharge will vest all of the property of the estate in the Debtors. Prior to that time, the automatic stay shall stay in full force and effect except that, for all creditors, pre-petition or post-petition, automatic stay is modified to allow creditors to provide regular statements, including tax reporting of interest paid and year-end balances; accurate credit reporting reflecting Debtors' compliance with the modified terms of their loans; and to make regular contacts directly to the

Page 10

Debtors or their counsel to request information, provide information or obtain clarification of any delays in payment or other concerns.

     5.2    The confirmation of this Plan will constitute a finding of fact and conclusion of the law by the Court that the Debtors presumptively are entitled to discharge pursuant to §727 and §1228 and that no debts are to be excepted from discharge under §523. Pursuant to §1228, the Debtors shall receive their discharge upon completion of all payments required hereunder and a hearing on their entitlement to discharge, or upon a further finding of the court.

     5.3    Until the Debtors' Plan is consummated, the Court shall retain such jurisdiction as is necessary to facilitate consummation of this Plan and to determine such matters in connection with this case as may be needed, including but not limited to:

     (a)    Determine all valid liens and claims (and amounts) against the Debtors and their property;

     (b)    Allowing the Debtors to reserve all the rights and powers held by them as Debtors-in-Possession, including but not limited to enforcing after the Confirmation Date any claims or causes of action which may exist in the Debtors' favor as Debtors-in-Possession (which are the same claims or causes of action existing in favor of a trustee in bankruptcy) and which may not have previously been enforced by the Debtor, specifically including, without limitation, any preference or collection claims. All claims and causes of action in favor of the Debtors as Debtors-in-Possession, including preference and other avoidance claims, are hereby reserved to be prosecuted after the confirmation date;

     (c)    Settling any disputes between the Debtors and their creditors;

     (d)    Continuing jurisdiction to stay enforcement of any claims or liens until consummation of this Plan;

     (e)    Entering any necessary orders requiring lienholders, judgment holders and mortgage holders to erase and cancel their liens and mortgages from any conveyance, mortgage or UCC or judgment docket records, so that, if necessary to ensure Plan performance, there will be no encumbrances on the Debtors' property after confirmation other than those claims and liens maintained under this Plan;

     (f)    Retaining such other jurisdiction as will ensure that the intents and purposes of this Plan are fulfilled;

     (g)    Approving or confirming any modification of this Plan after confirmation as proposed by the Debtor;

(h)     Approving financing under §364 as needed, except for short-term financing offered by vendors and suppliers on regular terms.

The jurisdiction of this Court shall end four years after the first plan payments are made in May 2014, or after all installments described in this Plan are made to unsecured creditors, and after a discharge is granted.

5.4     Upon application for good cause, the Court may (and reserves jurisdiction to) grant moratorium(s) and extension(s) of the payments to creditors in any class as set forth in this Plan above for any reasonable period of time due to circumstances presently unforeseeable and for acts of God which preclude payments to creditors under this Plan.

5.5     Payment to the Trustee shall constitute payment to creditors for the purpose of calculating any interest or late charges.

5.6     Notwithstanding anything contained above, the Debtors reserve the right to object to and/or defend against any claims filed in this case or which are attempted to be allowed or enforced against the Debtors or their assets.

5.7     The Debtors may pre-pay any payments or installments under this Plan without penalty.

5.8     The Debtors will provide to the Trustee, on a quarterly basis, cash flow reports within 30 days after the end of each Plan quarter, annual financial statements within 30 days after the end of each Plan year, copies of timely filed Federal income tax returns when filed and, upon demand, any other records which should be kept in the ordinary course of Debtors' business.

## ARTICLE VI
## CONSUMMATION AND CLOSING

Upon payments of all claims to unsecured creditors for four years hereunder, and when all distributions have been made to unsecured creditors on or about **May 2018**, this Plan shall be fully consummated and, after an appropriate hearing, discharge shall be entered and this case shall be closed.

The order closing the case shall specifically include, in addition to the normal injunctive relief against creditors taking any further actions to enforce their claims or liens (except to the extent such are maintained and extended under the Plan), provisions stating that any term or provision of any debt or security agreement between the Debtors and their creditors which provides that the filing of bankruptcy or other insolvency proceeding shall operate as a default under such agreement, or other similar language, shall be declared null and void, and creditors under this Plan shall be enjoined from instituting or continuing any legal action to enforce such term or provision.  Further, the order closing the case shall provide that all jurisdiction of the

Page 12

Court terminates (except as otherwise provided herein), except that this case may be reopened to enforce the injunctions contained in the order closing the case.

Respectfully Submitted May 21, 2014,

        STEINHILBER, SWANSON, MARES,
        MARONE & McDERMOTT

By:  /s/ JULIE F. STODOLKA
        JULIE E. FURMAN STODOLKA, Counsel for Debtors
        107 Church Avenue, P.O. Box 617
        Oshkosh, WI 54903-0617
        Tel: (920) 426-0456; Fax: (920) 426-5530
        jstodolka@oshkoshlawyers.com

/S/ LISA M BRUNNER              /S/ KEITH J. BRUNNER
Lisa M. Brunner, Co-Debtor        Keith J. Brunner, Debtor

Page 13

## EXHIBIT "A"
## LIQUIDATION ANALYSIS

*Result of Total Sale of Tangible Property*:

| | | |
|---|---|---|
| Net Sales Proceeds | | |
| Tillable Farm Land | $ 1,232,000 | |
| Buildings & Improvements | 437,000 | |
| Machinery | 216,000 | |
| TOTAL PROCEEDS | *$ 1,885,000* | a. |

*Taxes on Sale*:

| | | |
|---|---|---|
| Net Tax Basis in Tangible Property | | |
| Tillable Farm Land | $ 108,000 | |
| Buildings & Improvements | 379,923 | |
| Machinery | 20,157 | |
| TOTAL | *$ 1,376,920* | |

| | | |
|---|---|---|
| Gain on Sale | | |
| Capital Gain | $ 1,124,000 | |
| Ordinary Gain | 252,920 | |
| TOTAL GAIN | 1,376,920 | |

| | | |
|---|---|---|
| Tax on Gain | | |
| Federal Tax | 326,300 | |
| State Tax | 80,400 | |
| *TOTAL TAXES ON SALE* | *$  406,700* | b. |

ASSETS OF THE ESTATE:

| | | |
|---|---|---|
| Net sale proceeds after taxes | 1,478,300 | ( a - b ) |
| Non-exempt settlement proceeds | 53,167 | |
| Non-exempt 2013 income tax refunds | 5,831 | |
| | $  1,537,298 | c. |

| | | |
|---|---|---|
| LIABILITIES (as of Petition Date): | | |
| Secured Debt: | | |
| Fidelity Bank | 1,054,255 | |
| FSA | 536,220 | |
| Judgment liens (2) | 26,000 | |
| Unsecured creditors | 530,310 | |
| TOTAL | $  2,146,785 | d. |

| | | |
|---|---|---|
| NET PROCEEDS TO PAY | | |
| UNSECURED CREDITORS | < $   609,487 > | ( c - d ) |

***Detailed assumptions available upon request.***

**EXHIBIT 'A'**

**Keith Brunner**

**Forecasted Quarterly Cash Flow**
**For the Period 1-1-14 through 6-30-18**

|  | Actual Quarter Ending 03/31/14 | Forecast Quarter Ending 06/30/14 | Forecast Quarter Ending 09/30/14 | Forecast Quarter Ending 12/31/14 | Annual Forecast Total 12/31/14 | Forecast Quarter Ending 03/31/15 | Forecast Quarter Ending 06/30/15 | Forecast Quarter Ending 09/30/15 | Forecast Quarter Ending 12/31/15 | Annual Forecast Total 12/31/15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | |
| Milk sales | $ 31,138 | $ 75,340 | $72,050 | $ 71,120 | $ 249,688 | $70,940 | $71,610 | $ 72,190 | $ 72,800 | $ 287,540 |
| Live Stock Sales | 7,886 | 13,752 | 13,752 | 13,752 | 49,142 | 1,100 | 1,200 | 1,200 | 1,700 | 5,200 |
| Custom Cattle Raising | – | 23,815 | – | – | 23,815 | 14,166 | 14,166 | 14,166 | 14,166 | 56,664 |
| Crop Input Financing | – | – | – | 1,200 | 1,200 | – | 12,173 | – | – | 12,173 |
| Wages earned from outside work | 2,363 | 2,363 | 2,363 | 2,363 | 9,462 | 2,300 | 2,300 | 2,300 | 2,300 | 9,200 |
| Cash Transferred from Escrow Account | 63,126 | – | – | – | 63,126 | – | – | – | – | – |
| Financing of Herd | 64,000 | – | – | – | 64,000 | – | – | – | – | – |
| **Total Revenue** | 168,514 | 115,270 | 88,205 | 88,435 | 460,424 | 88,506 | 101,449 | 89,856 | 90,966 | 370,777 |
| **Direct Operating Costs** | | | | | | | | | | |
| Bulk Feed | | | | | | | | | | |
| Purchased | 21,740 | 13,670 | 11,922 | 5,488 | 52,820 | 1,687 | 1,766 | 1,918 | 1,853 | 7,224 |
| Grown and Harvested | | | | | | | | | | |
| Land rent | – | 1,500 | – | 11,250 | 12,750 | 4,000 | 1,500 | – | 7,250 | 12,750 |
| Inputs | – | 23,815 | – | – | 23,815 | – | 24,173 | – | – | 24,173 |
| Equipment Rental | – | 1,000 | 2,000 | – | 3,000 | – | 1,015 | 2,030 | – | 3,045 |
| Fuel Costs | – | 2,179 | 4,689 | 1,843 | 8,710 | – | 2,712 | 4,759 | 1,370 | 8,841 |
| Custom Farming | – | 800 | 1,200 | – | 2,000 | – | 800 | 1,200 | – | 2,000 |
| Crop Insurance | – | – | 600 | – | 600 | – | – | 600 | – | 600 |
| Processed Feed | 4,330 | 13,559 | 13,618 | 10,443 | 41,950 | 8,761 | 8,676 | 8,710 | 8,618 | 34,765 |
| **Total Bulk Feed Costs** | 26,070 | 56,523 | 34,029 | 29,024 | 145,645 | 14,448 | 40,642 | 19,217 | 19,091 | 93,398 |
| Heifer Raising Costs | | | | | | | | | | |
| Heifer Grower Costs | – | – | – | 2,346 | 2,346 | 4,974 | 6,491 | 9,370 | 11,865 | 32,700 |
| Breeding Costs | – | – | – | – | – | – | – | – | 500 | 500 |
| **Total Heifer Raising Costs** | – | – | – | 2,346 | 2,346 | 4,974 | 6,491 | 9,370 | 12,365 | 33,200 |
| Dairy Supplies | 3,491 | 2,604 | 2,604 | 2,571 | 11,270 | 2,610 | 2,574 | 2,574 | 2,538 | 10,296 |
| Veterinary and breeding | 4,149 | 2,802 | 2,802 | 2,766 | 12,519 | 5,808 | 3,769 | 2,769 | 2,730 | 15,076 |
| Testing and trimming | – | 621 | 621 | 612 | 1,854 | 621 | 612 | 612 | 606 | 2,451 |
| **Total Direct Costs** | 33,710 | 62,550 | 40,056 | 37,319 | 173,634 | 28,461 | 54,088 | 34,542 | 37,330 | 154,421 |
| **Cash Flow after Direct Costs** | 134,804 | 52,720 | 48,150 | 51,117 | 286,790 | 60,045 | 47,361 | 55,314 | 53,636 | 216,356 |


EXHIBIT
B

**Keith Brunner**

**Forecasted Quarterly Cash Flow**

**For the Period 1-1-14 through 6-30-18**

| | Actual Quarter Ending 03/31/14 | Forecast Quarter Ending 06/30/14 | Forecast Quarter Ending 09/30/14 | Forecast Quarter Ending 12/31/14 | Annual Forecast Total 12/31/14 | Forecast Quarter Ending 03/31/15 | Forecast Quarter Ending 06/30/15 | Forecast Quarter Ending 09/30/15 | Forecast Quarter Ending 12/31/15 | Annual Forecast Total 12/31/15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Costs** | | | | | | | | | | |
| Office Supply/Postage | 82 | 60 | 60 | 60 | 262 | 60 | 60 | 60 | 60 | 240 |
| Repairs and maintenance | 3,964 | 1,878 | 1,878 | 4,378 | 12,098 | 4,315 | 1,905 | 1,905 | 1,905 | 10,030 |
| Gas and oil | 3,155 | 450 | 450 | 450 | 4,505 | 3,349 | 456 | 456 | 456 | 4,717 |
| Utilities | 3,808 | 2,160 | 2,052 | 2,700 | 10,720 | 3,960 | 2,200 | 2,090 | 2,750 | 11,000 |
| Telephone | 1,392 | 600 | 600 | 600 | 3,192 | 600 | 600 | 600 | 600 | 2,400 |
| Taxes and licenses | 4,153 | - | 4,003 | - | 8,156 | 4,003 | - | 4,060 | - | 8,063 |
| Insurance - general | 3,450 | 2,001 | 2,001 | 2,001 | 9,453 | 3,554 | 2,031 | 2,031 | 2,031 | 9,647 |
| Legal and accounting | - | 600 | 600 | 600 | 1,800 | 406 | 609 | 609 | 609 | 2,233 |
| Travel | - | 60 | 60 | 60 | 180 | 60 | 60 | 60 | 60 | 240 |
| Miscellaneous | 436 | 450 | 450 | 450 | 1,786 | 455 | 456 | 456 | 456 | 1,823 |
| **Total Operating Costs** | 20,439 | 8,259 | 12,154 | 11,299 | 52,151 | 20,762 | 8,377 | 12,327 | 8,927 | 50,393 |
| **Cash Flow after Operating Costs** | 114,364 | 44,461 | 35,996 | 39,818 | 234,639 | 39,283 | 38,984 | 42,987 | 44,709 | 165,963 |
| **Debt Service** | | | | | | | | | | |
| Fidelity Bank loan 7818 | - | 9,690 | 14,615 | 14,615 | 38,921 | 14,297 | 19,422 | 19,422 | 19,422 | 72,564 |
| Fidelity Bank loan 7821 | - | - | - | - | - | - | - | - | - | - |
| Fidelity Bank loan 807824 | - | - | - | - | - | - | - | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | - | - |
| FSA Loan 47-26 | - | - | - | 3,663 | 3,663 | - | - | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 1,799 | 1,799 |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 5,948 | 5,948 |
| Loan for Herd | 278 | 834 | 834 | 834 | 2,779 | 2,480 | 5,773 | 5,773 | 5,773 | 19,798 |
| Crop Input Loan | - | - | 14,453 | 9,635 | 24,088 | - | - | 8,887 | 3,425 | 12,312 |
| Unsecured Creditors | - | - | - | - | - | - | - | - | - | - |
| | 278 | 10,524 | 29,902 | 28,747 | 69,451 | 16,777 | 25,195 | 34,082 | 36,367 | 112,421 |
| **Cash Flow after Debt Service** | 114,087 | 33,937 | 6,094 | 11,070 | 165,187 | 22,506 | 13,789 | 8,905 | 8,342 | 53,542 |
| **Other Expenditures** | | | | | | | | | | |
| Owners Draw | 3,925 | 3,925 | 3,925 | 3,925 | 15,699 | 3,925 | 3,925 | 3,925 | 3,925 | 15,699 |
| Chapter Trustee Fees | - | 969 | 1,462 | 1,462 | 3,893 | 1,430 | - | - | - | 1,430 |
| Purchase of Herd | 107,250 | - | - | - | 107,250 | - | - | - | - | - |
| Equipment Replacement Reserve | - | 15,000 | - | - | 15,000 | 15,000 | 5,000 | - | - | 20,000 |
| **Total Capital Expenditures** | 111,175 | 19,894 | 5,387 | 5,387 | 141,842 | 20,355 | 8,925 | 3,925 | 3,925 | 37,129 |
| **Cash Flow after Capital Expenditures** | 2,912 | 14,043 | 707 | 5,684 | 23,346 | 2,151 | 4,865 | 4,981 | 4,417 | 16,414 |
| **Beginning Cash** | 633 | 3,545 | 17,588 | 18,295 | 633 | 23,979 | 26,130 | 30,994 | 35,975 | 23,979 |
| **Ending Cash** | $ 3,545 | $ 17,588 | $18,295 | $ 23,979 | $ 23,979 | $26,130 | $30,994 | $ 35,975 | $ 40,392 | $ 40,392 |

Keith Brunner

5/21/2014

## Forecasted Quarterly Cash Flow
### For the Period 1-1-14 through 6-30-18

| | Forecast Quarter Ending 03/31/16 | Forecast Quarter Ending 06/30/16 | Forecast Quarter Ending 09/30/16 | Forecast Quarter Ending 12/31/16 | Annual Forecast Total 12/31/16 | Forecast Quarter Ending 03/31/17 | Forecast Quarter Ending 06/30/17 | Forecast Quarter Ending 09/30/17 | Forecast Quarter Ending 12/31/17 | Annual Forecast Total 12/31/17 | Forecast Quarter Ending 03/31/18 | Forecast Quarter Ending 06/30/18 | Annual Forecast Total 06/30/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Milk sales | $ 75,790 | $ 77,100 | $ 80,970 | $ 85,110 | $ 318,970 | $ 98,810 | $ 114,770 | $ 132,210 | $ 138,230 | $ 484,020 | $ 135,810 | $ 137,710 | $ 273,520 |
| Live Stock Sales | 2,515 | 1,500 | 2,416 | 1,700 | 8,130 | 2,915 | 3,215 | 5,845 | 13,565 | 25,540 | 11,435 | 14,280 | 25,715 |
| Custom Cattle Raising | 14,592 | 14,592 | 14,592 | 14,592 | 58,368 | 15,030 | 11,274 | 11,274 | 11,274 | 48,852 | 11,610 | 11,610 | 23,220 |
| Crop Input Financing | - | 13,536 | - | - | 13,536 | - | - | - | - | - | - | - | - |
| Wages earned from outside work | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Transferred from Escrow Account | 2,300 | 2,300 | 2,300 | 2,300 | 9,200 | 2,300 | 2,300 | 2,300 | 2,300 | 9,200 | 2,300 | 2,300 | 4,600 |
| Financing of Herd | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Revenue | 95,197 | 109,028 | 100,277 | 103,702 | 408,204 | 119,055 | 131,559 | 151,629 | 165,369 | 567,612 | 161,155 | 165,900 | 327,055 |
| **Direct Operating Costs** | | | | | | | | | | | | | |
| **Bulk Feed** | | | | | | | | | | | | | |
| Purchased | 1,662 | 1,593 | 1,611 | 1,745 | 6,611 | 2,061 | 2,491 | 2,858 | 2,927 | 10,337 | 2,776 | 2,802 | 5,578 |
| **Grown and Harvested** | | | | | | | | | | | | | |
| Land rent | 6,060 | 1,523 | 1,500 | 3,859 | 12,942 | - | 1,523 | 1,500 | 9,919 | 12,942 | - | 1,523 | 1,523 |
| Inputs | - | 24,536 | - | - | 24,536 | - | 24,904 | - | - | 24,904 | - | 25,278 | 25,278 |
| Equipment Rental | - | 1,030 | - | 2,060 | 3,090 | - | 1,045 | - | 2,091 | 3,136 | - | 1,061 | 1,061 |
| Fuel Costs | - | 2,745 | 4,330 | 1,898 | 8,973 | - | 2,279 | 4,903 | 1,926 | 9,108 | - | 2,313 | 2,313 |
| Custom Farming | - | 812 | 1,218 | - | 2,030 | - | 812 | 1,218 | - | 2,030 | - | 812 | 812 |
| Crop Insurance | - | - | 609 | - | 609 | - | - | 609 | - | 609 | - | - | - |
| Total Grown and Harvested | 6,060 | 30,646 | 7,657 | 7,817 | 52,180 | - | 30,563 | 8,230 | 13,936 | 52,729 | - | 30,987 | 30,987 |
| Processed Feed | 8,796 | 8,736 | 8,772 | 9,936 | 36,240 | 11,703 | 13,499 | 15,452 | 15,948 | 56,602 | 15,896 | 16,076 | 31,972 |
| Total Bulk Feed Costs | 16,518 | 40,975 | 18,040 | 19,498 | 95,031 | 13,764 | 46,553 | 26,540 | 32,811 | 119,668 | 18,672 | 49,865 | 68,537 |
| **Heifer Raising Costs** | | | | | | | | | | | | | |
| Heifer Grower Costs | 14,216 | 17,542 | 20,642 | 20,963 | 73,363 | 19,362 | 18,287 | 17,098 | 15,353 | 70,099 | 15,556 | 15,728 | 31,284 |
| Breeding Costs | 750 | 750 | 800 | 700 | 3,000 | 450 | 450 | 450 | 450 | 1,800 | 450 | 450 | 900 |
| Total Heifer Raising Costs | 14,966 | 18,292 | 21,442 | 21,663 | 76,363 | 19,812 | 18,737 | 17,548 | 15,803 | 71,899 | 16,006 | 16,178 | 32,184 |
| Dairy Supplies | 2,577 | 2,541 | 2,541 | 2,683 | 10,342 | 3,266 | 3,775 | 4,307 | 4,608 | 15,956 | 4,674 | 4,674 | 9,348 |
| Veterinary and breeding | 4,772 | 3,733 | 2,733 | 3,886 | 15,124 | 4,514 | 5,062 | 5,634 | 5,959 | 21,169 | 9,031 | 5,031 | 14,062 |
| Testing and trimming | 612 | 606 | 606 | 639 | 2,463 | 778 | 899 | 1,026 | 1,098 | 3,801 | 1,113 | 1,113 | 2,226 |
| Total Direct Costs | 39,445 | 66,147 | 45,362 | 48,369 | 199,323 | 42,134 | 75,026 | 55,055 | 60,279 | 232,493 | 49,496 | 76,861 | 126,357 |
| Cash Flow after Direct Costs | 55,752 | 42,881 | 54,915 | 55,333 | 208,881 | 76,921 | 56,533 | 96,574 | 105,091 | 335,119 | 111,659 | 89,039 | 200,698 |

Case 14-20297-mdm    Doc 31    Filed 05/21/14    Page 17 of 26

Keith Brunner

Forecasted Quarterly Cash Flow
For the Period 1-1-14 through 6-30-18

| | Forecast Quarter Ending 03/31/16 | Forecast Quarter Ending 06/30/16 | Forecast Quarter Ending 09/30/16 | Forecast Quarter Ending 12/31/16 | Annual Forecast Total 12/31/16 | Forecast Quarter Ending 03/31/17 | Forecast Quarter Ending 06/30/17 | Forecast Quarter Ending 09/30/17 | Forecast Quarter Ending 12/31/17 | Annual Forecast Total 12/31/17 | Forecast Quarter Ending 03/31/18 | Forecast Quarter Ending 06/30/18 | Annual Forecast Total 06/30/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Costs** | | | | | | | | | | | | | |
| Office Supply/Postage | 60 | 60 | 60 | 60 | 240 | 60 | 60 | 60 | 60 | 240 | 60 | 60 | 120 |
| Repairs and maintenance | 4,378 | 1,932 | 1,932 | 1,932 | 10,174 | 4,441 | 1,959 | 1,959 | 1,959 | 10,318 | 4,507 | 1,986 | 6,493 |
| Gas and oil | 3,399 | 462 | 462 | 462 | 4,785 | 3,449 | 468 | 468 | 468 | 4,853 | 3,500 | 474 | 3,974 |
| Utilities | 4,020 | 2,240 | 2,110 | 2,790 | 11,160 | 4,080 | 2,280 | 2,130 | 2,830 | 11,320 | 4,140 | 2,320 | 6,460 |
| Telephone | 600 | 600 | 600 | 600 | 2,400 | 600 | 600 | 600 | 600 | 2,400 | 600 | 600 | 1,200 |
| Taxes and licenses | 4,060 | - | 4,120 | - | 8,180 | 4,120 | - | 4,180 | - | 8,300 | 4,180 | - | 4,180 |
| Insurance - general | 3,607 | 2,061 | 2,061 | 2,061 | 9,790 | 3,660 | 2,091 | 2,091 | 2,091 | 9,933 | 3,714 | 2,121 | 5,835 |
| Legal and accounting | 412 | 618 | 618 | 618 | 2,266 | 418 | 627 | 627 | 627 | 2,299 | 424 | 636 | 1,060 |
| Travel | 60 | 60 | 60 | 60 | 240 | 60 | 60 | 60 | 60 | 240 | 60 | 60 | 120 |
| Miscellaneous | 461 | 462 | 462 | 462 | 1,847 | 467 | 468 | 468 | 468 | 1,871 | 473 | 474 | 947 |
| **Total Operating Costs** | 21,057 | 8,495 | 12,485 | 9,045 | 51,082 | 21,355 | 8,613 | 12,643 | 9,163 | 51,774 | 21,658 | 8,731 | 30,389 |
| **Cash Flow after Operating Costs** | 34,695 | 34,386 | 42,430 | 46,288 | 157,799 | 55,566 | 47,920 | 83,931 | 95,928 | 283,345 | 90,001 | 80,308 | 170,309 |
| **Debt Service** | | | | | | | | | | | | | |
| Fidelity Bank loan 7818 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fidelity Bank loan 7821 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fidelity Bank loan 807824 | 19,422 | 19,422 | 19,422 | 19,422 | 77,689 | 19,422 | 19,422 | 19,422 | 19,422 | 77,689 | 19,422 | 19,422 | 38,844 |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 1,800 | 1,800 | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 18,412 | 18,412 | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 14,538 | 14,538 | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | 13,257 | 13,257 | - | - | - |
| FSA Loan 47-26 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Loan for Herd | 5,773 | 5,773 | 5,773 | 5,773 | 23,091 | 5,773 | 5,773 | 5,773 | 5,773 | 23,091 | - | - | - |
| Crop Input Loan | - | - | 8,215 | 5,476 | 13,681 | 7,380 | - | - | - | 7,380 | 3,848 | - | 3,848 |
| Unsecured Creditors | - | - | - | 7,079 | 7,079 | - | 5,528 | 8,292 | 8,292 | 22,111 | 8,292 | 2,764 | 11,056 |
| Total Debt Service | 25,195 | 25,195 | 33,409 | 37,750 | 121,549 | 32,575 | 30,723 | 33,487 | 81,494 | 178,277 | 31,562 | 22,186 | 53,748 |
| **Cash Flow after Debt Service** | 9,500 | 9,191 | 9,020 | 8,538 | 36,250 | 22,991 | 17,198 | 50,445 | 14,434 | 105,068 | 58,439 | 58,122 | 116,561 |
| **Other Expenditures** | | | | | | | | | | | | | |
| Owners Draw | 3,925 | 3,925 | 3,925 | 3,925 | 15,699 | 3,925 | 3,925 | 3,925 | 3,925 | 15,699 | 3,925 | 3,925 | 7,849 |
| Chapter Trustee Fees | - | - | - | - | - | - | 553 | 829 | 829 | 2,211 | 829 | 276 | 1,105 |
| Purchase of Herd | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equipment Replacement Reserve | - | - | - | - | - | 15,000 | - | 25,000 | - | 40,000 | 25,000 | - | 25,000 |
| **Total Capital Expenditures** | 3,925 | 3,925 | 3,925 | 3,925 | 15,699 | 18,925 | 4,478 | 29,754 | 4,754 | 57,910 | 29,754 | 4,201 | 33,954 |
| **Cash Flow after Capital Expenditures** | 5,576 | 5,267 | 5,096 | 4,614 | 20,551 | 4,067 | 12,720 | 20,691 | 9,680 | 47,158 | 28,685 | 53,921 | 82,606 |
| Beginning Cash | 40,392 | 45,968 | 51,234 | 56,330 | 40,392 | 60,944 | 65,011 | 77,731 | 98,422 | 60,944 | 108,102 | 136,788 | 108,102 |
| **Ending Cash** | $ 45,968 | $ 51,234 | $ 56,330 | $ 60,944 | $ 60,944 | $ 65,011 | $ 77,731 | $ 98,422 | $ 108,102 | $ 108,102 | $ 136,788 | $ 190,709 | $ 190,709 |

Keith Brunner (the Debtor)
Financial Assumptions for Plan of Reorganization

The financial statements are for a period from January 1, 2014 through June 30, 2018 and are presented by calendar quarter starting with the 1st quarter of 2014 showing actual results of cash flow and forecasted data for the quarters beginning with the 2nd quarter of 2014 ending with the 2nd quarter of 2018.

<u>**Revenue Assumptions**</u>:

### Milk Sales:

Milk produced and sold in a given month is paid to the producer (farmer) in two installments. The first installment is paid on the 26th of the month in which the milk is sold and is based on the total pounds of milk sold from the 1st of the month to the 15th of the month at an estimated value per hundred pounds of milk. This check is referred to as an "estimated" payment and for this forecast it is estimated to be 44% of the total value of all the milk produced and sold for the month. On the 16th of the following month, the second payment is received by the producer and is based on the total milk sold during the prior month times the actual value per hundred pounds of milk less the "estimated" payment paid on the 26th of the prior month. This payment to referred to as the "settlement" check and for this forecast it is estimated to be 56% of the total value of the milk sold in that prior month.

From each "milk check", the purchaser of the milk deducts for the cost to haul the milk, the national and state dairy marketing association fees, and any other costs for services/supplies provided to the producer. These charges are estimated to be 3.79% of the "gross milk check amount". In forecasting the "net milk revenue earned" the "gross milk revenue" was reduced by 3.79% to allow for these charges.

Since this forecast is a "Cash Flow" forecast, Milk Sales represent forecasted milk revenue paid (collected) to/by Keith Brunner. Forecasted Milk Revenue sold in each quarter of the forecast is adjusted to account for the timing difference between producing and selling the milk and actually collecting payment.

It is assumed the Keith Brunner will purchase 75 dairy cows beginning mid February 2014.

The table in Exhibit A lists the key assumptions used to forecast Milk Sales.

### Livestock Sales:

Keith Brunner breeds his dairy cows to maintain their milk production. The calves produced are either sold or in the case of heifer calves some will be raised be Keith to grow them into milk cows. Those heifers that are "finished" (ready to produce milk) are added to the milking herd or if there are more than are needed to replenish the milk herd the excess heifers are sold. Mature and poor producing milk cows are culled from the milk herd and sold. This allows Mr. Brunner to maintain a balanced milk herd which will achieve consistent production over many years. The table in Exhibit B lists the key assumptions related to the sale of calves, heifers, and milk cows.

1

**Custom Cattle Raising:**

The Debtor receives payment for caring for cattle at his farm which are owned by others. The fee is $275 per year per head. A 3.00% annual increase in the fee is assumed beginning in January 2015.

The forecast assumes that on average 200 head would be cared for each month from January 2014 through April 2017 and 150 head thereafter. All costs for feed, veterinary care, etc. are paid by the owner.

**Wages Earned From Outside Work:**

The Spouse of the Debtor is employed in a part time job outside of the farm. Her net take home pay averages approximately $2,300 per quarter.

The forecast assumes that she will continue this job through out the period of the forecast and thus her net income is included as revenue under this business plan.

**Direct Operating Cost Assumptions:**

**Bulk Feed;**

Bulk feed is composed of two main components. The first component (roughage) is dry hay (baled), haylage (chopped hay), silage (chopped corn), and corned. The second component is processed feed which is purchased from a feed producer that blends various inputs to provide a custom feed ration for the dairy herd.

In 2014, it is assumed that Mr. Brunner will purchase the roughage needed to feed the herd. The forecast identifies those purchases which are based on current feed prices which are expected to hold steady through the 2nd quarter of 2014. Also, it is assumed that Mr. Brunner will purchase annually "orchard grass" which will be mixed with corn silage and feed to non-lactating cows.

In 2014 and thereafter, Mr. Brunner will farm 282 acres of which it will rent 125 acres. This will allow him to grow and harvest all his roughage feed needs for 2015 through 2017.

The 2014 forecasted costs to rent crop land, plant, fertilize, insect spray crops, and harvest the crops are based on quotes received from on crop input suppliers for 2014 inputs. In 2015 and thereafter, a 1.50% inflation increase to these costs is assumed.

Processed Feed cost is based on $2.25 per milking cow per day. It is assumed that this cost remains unchanged in 2014 and increases by 1.50% annually beginning in 2015.

2

**Heifer Raising Costs:**

Theses costs are related to the process of growing a heifer calf into a pregnant adult dairy cow. This process takes approximately 24 months. The assumed cost per day to raise a heifer is as follows:

      A. Calf from 0 to 3 months is $2.55.
      B. Calf from 4 to 6 months is $0.69.
      C. Heifer from 7 to 12 months is $1.79.
      D. Heifer from 13 to 23 months is $2.68.

The forecast assumes that these costs will remain the same through 2014 and increase by 1.50% annually thereafter. The table in Exhibit C lists the key assumptions to the custom heifer costs.

The additional to the costs associated with the heifers is the cost of semen which is assumed to be $50 per breeding.

**Other Direct Costs:**

Theses costs are composed of Dairy supplies, Veterinary and Breeding Costs, and Testing and trimming costs. The forecast is based on an analysis of the historical costs, size of the herd and timing of payment of these costs. It is assumed that these costs will increase by 1.5% annually starting in 2015.

## Operating Cost Assumptions:

a. Certain expenses listed below were forecasted based on an analysis of the actual operating costs by quarter for 2012 and 2013. To allow for the effects of future inflation, these expenses increase 1.50% annually beginning in 2015.

      Office Supply/Postage
      Repairs and Maintenance
      Gas and oil
      Utilities
      Telephone
      Insurance – general
      Travel
      Miscellaneous

b. Taxes and license costs are made up of real estate tax expense and vehicle licensing fees. These expenses are based on analysis of historical costs and are assumed to increase by 3.00% annually beginning in 2015.

c. Legal and accounting fees. It is assumed that these costs will be substantially reduce in 2014 as the needs for these service return to levels experienced by the business prior to the financial stress it incurred. It is assumed that beginning in 2015 these costs will increase by 1.50% annually.

3

**Payments to Creditors:**

**Secured Creditors:**

a. Fidelity Bank. The balance as stated in Fidelity's Proof of Claim is $1,054,255. No payments will be made on this loan for the first 120 days after the filing date (1-13-14) of the chapter 12 proceeding to allow the debtor to acquire a dairy herd, produce and sell milk from the herd, and receive payment from milk sales. Beginning in May of 2014 and continuing through March 31, 2015 the debtor will pay interest only at the rate of 5.50% on a monthly basis. Beginning in April 2015 the debtor will make monthly loan payments of $6,474 including interest based on a 25 year amortization and a 5.50% interest rate. This loan will mature on March 31, 2040.

b. Farm Service Administration –Loan 43-26. Assumed balance of this loan is $6,351. The forecasted payments on this loan are based on the loan payment schedule provided by the lender. This loan will mature on October 2028.

c. Farm Service Administration –Loan 43-27. Assumed balance of this loan is $160,668. The forecasted payments on this loan are based on the loan payment schedule provided by the lender. This loan will mature on October 2028.

d. Farm Service Administration –Loan 43-28. Assumed balance of this loan is $142,003. The forecasted payments on this loan are based on the loan payment schedule provided by the lender. This loan will mature on October 2028.

e. Farm Service Administration –Loan 43-29. Assumed balance of this loan is $203,970. The forecasted payments on this loan are based on the loan payment schedule provided by the lender. This loan will mature on October 2044

f. Herd Loans. These loans are post petition funding for the purchase of a dairy herd. The assumed total balance of these loans is $64,000. These loans will receive monthly interest payments totaling $278 beginning March 20, 2014 through February 20, 2015. Beginning on March 20, 2015 the debtor will make monthly loan payments of $1,924 including principle based on a 3 year amortization plus interest.

g. Crop Input Loan. It is assumed that in 2014, 2015 and 2016 the debtor will receive financing based on ordinary terms from suppliers to fund the inputs purchased to plant his crops. This loan will be repaid from July through November each year with interest. Thereafter, crop inputs will be funded through cash surplus.

**Unsecured Creditors:**

a. It is assumed that the unsecured creditors will receive $33,167 in debt payments based on a liquidation analysis. These payments will be paid in twelve monthly installments beginning in May 2017.

**Other Expenditures:**

**Owners Draw.** It is assumed that the owners will receive a $4,000 per quarter payment through out this forecast.

**Chapter 12 Trustee Fees.** It is assumed that trustee fees would be at the rate of 10% of the amounts paid Fidelity Bank from May 2014 through March of 2015 and the amounts paid to the unsecured creditors from May of 2017 through April of 2018, both of which would be paid through the Chapter 12 Trustee.

**Purchase of Dairy Herd.** The debtor purchased 75 dairy cows in the month of February at a total cost of $107,250. The funding for this expenditure was provided by post petition loans of $64,000 and the debtors funds of $43,250.

**Equipment Refurbishment/Replacement Reserve.** The following is the forecasted budget for the refurbishment/replacement of equipment needed to operate the farm.

| Quarter Ended | Amount |
|---|---|
| 6/30/14 | $ 15,000 |
| 3/31/15 | $ 15,000 |
| 9/30/15 | $ 5,000 |
| 3/31/17 | $ 15,000 |
| 9/30/17 | $ 25,000 |
| 3/31/18 | $ 25,000 |

5

Keith Brunner

Exhibit A

Milk Revenue and Milking Herd

Milking Herd Data

| Quarter Ending | Ave Milk Cows | Ave Dry Cows | Ave Milking Cows | Ave Price per 100 lbs | Ave Lbs of Milk Produced | Lbs Produced per cow/day | Net Milk Revenue Earned | Milk Revenue Collected | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|---|
| 03/31/14 | 33 | 6 | 28 | $ 23.45 | 190,695 | 57.90 | $ 44,447 | $ 31,138 | $ 16,184 |
| 06/30/14 | 75 | 9 | 66 | $ 21.50 | 348,075 | 57.95 | $ 72,550 | $ 75,340 | $ 13,395 |
| 09/30/14 | 75 | 9 | 66 | $ 20.50 | 360,450 | 59.66 | $ 71,620 | $ 72,090 | $ 12,925 |
| 12/31/14 | 74 | 9 | 65 | $ 20.00 | 370,134 | 61.90 | $ 71,730 | $ 71,120 | $ 13,535 |
| 03/31/15 | 74 | 9 | 65 | $ 19.50 | 374,239 | 63.97 | $ 70,740 | $ 70,940 | $ 13,334 |
| 06/30/15 | 73 | 9 | 64 | $ 19.25 | 382,743 | 66.06 | $ 71,400 | $ 71,610 | $ 13,126 |
| 09/30/15 | 73 | 9 | 64 | $ 18.75 | 397,216 | 68.17 | $ 72,180 | $ 72,190 | $ 13,121 |
| 12/31/15 | 72 | 9 | 63 | $ 18.50 | 411,428 | 71.35 | $ 73,790 | $ 72,800 | $ 14,112 |
| 03/31/16 | 72 | 8 | 64 | $ 18.50 | 423,204 | 73.05 | $ 75,960 | $ 75,790 | $ 14,280 |
| 06/30/16 | 71 | 8 | 63 | $ 18.50 | 430,299 | 75.06 | $ 77,220 | $ 77,100 | $ 14,403 |
| 09/30/16 | 71 | 8 | 63 | $ 18.50 | 452,774 | 78.53 | $ 81,280 | $ 80,970 | $ 14,717 |
| 12/31/16 | 75 | 9 | 66 | $ 18.50 | 490,396 | 75.10 | $ 88,130 | $ 85,110 | $ 17,741 |
| 03/31/17 | 90 | 10 | 80 | $ 18.25 | 571,840 | 75.33 | $ 101,540 | $ 98,810 | $ 20,468 |
| 06/30/17 | 104 | 12 | 92 | $ 18.25 | 657,875 | 75.03 | $ 116,940 | $ 114,770 | $ 22,635 |
| 09/30/17 | 119 | 14 | 105 | $ 18.25 | 757,448 | 75.32 | $ 134,760 | $ 132,210 | $ 25,189 |
| 12/31/17 | 127 | 14 | 113 | $ 18.25 | 783,646 | 75.60 | $ 139,460 | $ 138,230 | $ 26,415 |
| 03/31/18 | 127 | 14 | 113 | $ 18.00 | 771,896 | 75.70 | $ 135,460 | $ 135,810 | $ 26,068 |
| 06/30/18 | 127 | 14 | 113 | $ 18.00 | 782,074 | 75.84 | $ 137,260 | $ 137,710 | $ 25,620 |

Keith Brunner

Exhibit B

**Livestock Sales**

| Quarter Ending | Quantity Heifers | Quantity Cows | Quantity Calves | Sale Piece Heifers | Sale Price Cows | Sale Price Calves | Total Revenue |
|---|---|---|---|---|---|---|---|
| 03/31/14 | - | - | - | $ 1,350 | $ 915 | $ 100 | - |
| 06/30/14 | - | - | - | $ 1,350 | $ 915 | $ 100 | - |
| 09/30/14 | - | - | - | $ 1,350 | $ 915 | $ 100 | - |
| 12/31/14 | - | - | 12 | $ 1,350 | $ 915 | $ 100 | 1,200 |
| 03/31/15 | - | - | 11 | $ 1,350 | $ 915 | $ 100 | 1,100 |
| 06/30/15 | - | - | 12 | $ 1,350 | $ 915 | $ 100 | 1,200 |
| 09/30/15 | - | - | 12 | $ 1,350 | $ 915 | $ 100 | 1,200 |
| 12/31/15 | - | - | 17 | $ 1,350 | $ 915 | $ 100 | 1,700 |
| 03/31/16 | - | 1 | 16 | $ 1,350 | $ 915 | $ 100 | 2,515 |
| 06/30/16 | - | - | 15 | $ 1,350 | $ 915 | $ 100 | 1,500 |
| 09/30/16 | - | 1 | 15 | $ 1,350 | $ 915 | $ 100 | 2,415 |
| 12/31/16 | - | - | 17 | $ 1,350 | $ 915 | $ 100 | 1,700 |
| 03/31/17 | - | 1 | 20 | $ 1,350 | $ 915 | $ 100 | 2,915 |
| 06/30/17 | - | 1 | 23 | $ 1,350 | $ 915 | $ 100 | 3,215 |
| 09/30/17 | - | 3 | 31 | $ 1,350 | $ 915 | $ 100 | 5,845 |
| 12/31/17 | - | 11 | 35 | $ 1,350 | $ 915 | $ 100 | 13,565 |
| 03/31/18 | - | 9 | 32 | $ 1,350 | $ 915 | $ 100 | 11,435 |
| 06/30/18 | - | 12 | 33 | $ 1,350 | $ 915 | $ 100 | 14,280 |

Keith Brunner

Exhibit C
Summary of Heifer Herd Assumptions

| | Quantity | | | | | Cost Per Animal Per Day | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Quarter Ending | 0 to 3 Months | 4 to 6 Months | 7 to 12 Months | 13 to 23 Months | Total Herd | 0 to 3 Months | 4 to 6 Months | 7 to 12 Months | 13 to 23 Months | Total Finishing Costs |
| 03/31/14 | - | - | - | - | - | $ 2.55 | $ 0.69 | $ 1.79 | $ 2.68 | $ - |
| 06/30/14 | - | - | - | - | - | $ 2.55 | $ 0.69 | $ 1.79 | $ 2.68 | $ - |
| 09/30/14 | - | - | - | - | - | $ 2.55 | $ 0.69 | $ 1.79 | $ 2.68 | $ - |
| 12/31/14 | 15 | - | - | - | 15 | $ 2.55 | $ 0.69 | $ 1.79 | $ 2.68 | $ 2,346 |
| 03/31/15 | 20 | 10 | - | - | 30 | $ 2.59 | $ 0.70 | $ 1.81 | $ 2.72 | $ 4,974 |
| 06/30/15 | 20 | 15 | 10 | - | 45 | $ 2.59 | $ 0.70 | $ 1.81 | $ 2.72 | $ 6,491 |
| 09/30/15 | 22 | 15 | 25 | - | 62 | $ 2.59 | $ 0.70 | $ 1.81 | $ 2.72 | $ 9,370 |
| 12/31/15 | 17 | 16 | 30 | 10 | 73 | $ 2.59 | $ 0.70 | $ 1.81 | $ 2.72 | $ 11,865 |
| 03/31/16 | 12 | 14 | 31 | 25 | 82 | $ 2.63 | $ 0.72 | $ 1.84 | $ 2.76 | $ 14,216 |
| 06/30/16 | 12 | 9 | 25 | 40 | 86 | $ 2.63 | $ 0.72 | $ 1.84 | $ 2.76 | $ 17,542 |
| 09/30/16 | 12 | 9 | 17 | 56 | 94 | $ 2.63 | $ 0.72 | $ 1.84 | $ 2.76 | $ 20,642 |
| 12/31/16 | 12 | 9 | 18 | 55 | 94 | $ 2.63 | $ 0.72 | $ 1.84 | $ 2.76 | $ 20,963 |
| 03/31/17 | 12 | 9 | 18 | 49 | 88 | $ 2.67 | $ 0.73 | $ 1.87 | $ 2.80 | $ 19,362 |
| 06/30/17 | 15 | 9 | 18 | 43 | 85 | $ 2.67 | $ 0.73 | $ 1.87 | $ 2.80 | $ 18,287 |
| 09/30/17 | 15 | 9 | 18 | 35 | 77 | $ 2.67 | $ 0.73 | $ 1.87 | $ 2.80 | $ 17,098 |
| 12/31/17 | 12 | 12 | 18 | 33 | 75 | $ 2.67 | $ 0.73 | $ 1.87 | $ 2.80 | $ 15,353 |
| 03/31/18 | 12 | 9 | 21 | 33 | 75 | $ 2.71 | $ 0.74 | $ 1.90 | $ 2.84 | $ 15,556 |
| 06/30/18 | 12 | 9 | 21 | 33 | 75 | $ 2.71 | $ 0.74 | $ 1.90 | $ 2.84 | $ 15,728 |